UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

LLOYD'S ACCEPTANCE CORP., d/b/a )
LLOYD'S DEVELOPMENT CO., et al., )
                                 )
              Plaintiffs,        )
                                 )
       v.                        )        No. 4:05 CV 1934 DDN
                                 )
AFFILIATED FM INSURANCE COMPANY, )
et al.,                          )
                                 )
              Defendants.        )

### MEMORANDUM AND ORDER

This action is before the court on the motion of plaintiffs Lloyd's Acceptance Corp. d/b/a Lloyd's Development Co. and Affordable Communities LP to compel production of documents (Doc. 120).

On March 1, 2012, the court heard oral argument on the motion and received the subject documents for *in camera* review.  The court has also received Affiliated's revised privilege log (Doc. 121-2) and a complete transcript of Michael Smith's deposition testimony.  (Doc. 131-1.)

In their motion to compel, Lloyd's and Affordable (collectively "Lloyd's") seek to compel disclosure of nine e-mails listed in Affiliated's revised privilege log:

    (a)   July 14, 2004 e-mail from Michael Smith[1] to Mark Romman,[2] Craig Bern,[3] and Jonathan Mishara;[4]

    (b)   October 6, 2004 e-mail from Craig Bern to Michael Smith and Mark Romman;

    (c)   October 6, 2004 e-mail from Michael Smith and Mark Romman to Craig Bern, Michael Smith, and Mark Romman;

---

[1]Michael Smith is Affiliated's general adjuster in St. Louis and the primary adjuster assigned to plaintiffs' claim.

[2]Mark Romman is Affiliated's branch claims manager in Seattle.

[3]Craig Bern is Affiliated's senior general adjuster in Dallas.

[4]Jonathan Mishara is Affiliated's in-house counsel.

(d)   October 8, 2004 e-mail from Michael Smith to Randall Kinkaid;[5]

(e)   October 25, 2004 e-mail from Michael Smith to Craig Bern; this e-mail ends a string of e-mails between Barry Cohen,[6] Michael Smith, Larry Watson,[7] and an unidentified recipient;[8] this e-mail also includes an attached draft letter;

(f)   November 8, 2004 e-mail from Craig Bern to Andrew Scanlon[9] and Michael Smith; this e-mail ends a string of e-mails attached to and including e-mail (e), listed above; this e-mail also includes an attached draft letter;

(g)   December 10, 2004 e-mail from Andrew Scanlon to Michael Smith, Craig Bern, and Mark Romman; this e-mail was a response to and includes a December 10, 2004 e-mail from Michael Smith to Andrew Scanlon, Craig Bern, and Mark Romman; this e-mail also includes an attached draft letter;

(h)   March 10, 2005 e-mail from Mark Romman to Michael Smith and Craig Bern; this e-mail includes an attached draft document; and

(i)   March 21, 2005 e-mail from Craig Bern to Michael Smith and Mark Romman; this e-mail was a response to and includes e-mail (h), listed above; this e-mail also includes an attached draft document.

(Docs. 120, 121.)

At the March 1, 2012 hearing, Affiliated agreed to disclose e-mails (b)-(d), with the understanding that disclosure would not be construed as a waiver of the possible protections of the work product doctrine and

---

[5]Randall Kincaid is an employee of Affiliated's re-insurer.

[6]Barry Cohen is the president of Lloyd's.

[7]Larry Watson is the Deputy Chief of the Elevator Safety Unit of the State Fire Marshal's Office.

[8]The other recipient is identified only by an e-mail address, which suggests that he is a member of another insurance company.

[9]Andrew Scanlon is Affiliated's in-house counsel.

the attorney-client privilege as to the remaining e-mails. Thus, e-mails (a) and (e)-(i) remain in dispute.

Affiliated argues that e-mails (a) and (e)-(i) are shielded by the work product doctrine and that e-mails (a), (f), and (g) are protected by the attorney-client privilege. (Docs. 121-2, 125.) Lloyd's argues that neither the work product doctrine nor the attorney-client privilege apply. (Docs. 120, 121, 127.)

### Relevant Facts

In May, 2004, Affiliated's primary claims adjuster, Michael Smith, received notice of Lloyd's claim. (Doc. 125-1 at ¶ 3.) On June 11, 2004, Smith inspected the subject property, had discussions with the president of Lloyd's, Barry Cohen, and received a copy of a repair estimate. (Id. at ¶ 4; Doc. 125-2.)

On June 28, 2004, Smith wrote a letter to Cohen, explaining that "[e]ach individual instance of electrical or mechanical breakdown resultant of the long[-]term red rouge condition or resultant of faulty workmanship would be considered a separate occurrence of loss under [the insurance] policy and subject to a separate $10,000 deductible." (Doc. 125-1 at ¶ 5; 125-2.)

Thereafter, Cohen and Smith had a telephone conversation in which Cohen expressed his disagreement with Smith's position that the breakdowns were separate occurrences, each subject to a deductible. (Doc. 125-1 at ¶ 6.) Cohen also stated that he was considering hiring outside counsel to assist him in making his claim. (Id.)

On July 14, 2004, in a telephone conversation with Smith, Cohen confirmed that he had hired outside counsel to assist him in making his claim. (Id. at ¶ 7.)

That day, Smith conferred with Affiliated's in-house counsel Jonathan Mishara regarding the coverage dispute and Lloyd's hiring of outside counsel. (Id.) Later that day, Smith sent an e-mail to two other claims adjusters, Mark Romman and Craig Bern, with Mishara "CC'd" on the e-mail, in which Smith summarized his request for the advice of counsel. (Id.)

- 3 -

On September 30, 2004, Smith received a letter from Cohen in which Cohen argued that there was only one loss caused by prolonged exposure to red rouge and thus only one deductible applied. (Id. at ¶ 9; Doc. 125-3.) Cohen enclosed an updated repair report estimating the loss at $980,000, and demanded payment of the claim in full. (Doc. 125-1 at ¶ 9; Doc. 125-3.)

On October 25 2004, Smith e-mailed Bern to discuss how best to respond to Cohen's argument for coverage. (Doc. 125-1 at ¶ 10.) On November 8, 2004, Smith and Bern e-mailed Affiliated's in-house counsel Andrew Scanlon for further related discussions. (Id.)

On November 9, 2004, Smith received a letter from Lloyd's outside counsel, Joseph Blanner. (Id. at ¶ 11; Doc. 125-4.) In the letter, Blanner challenged Affiliated's coverage position, requested immediate payment of the approximately $980,000, and threatened litigation if Affiliated did not pay. (Doc. 125-1 at ¶ 11; Doc. 125-4.)

On December 10, 2004, Smith e-mailed Scanlon, Bern, and Romman requesting advice on how best to communicate Affiliated's coverage position to Lloyd's. (Doc. 125-1 at ¶ 12.)

Also on December 10, 2004, Affiliated issued its coverage determination letter officially denying Lloyd's claim. (Id. at ¶ 13; Doc. 125-5.) Specifically, Affiliated stated that the losses were not within policy coverage, that the losses were excluded by policy exclusions, and that Lloyd's had failed to submit evidence of a "resulting loss" as required by the policy. (Doc. 125-5.)

On December 21, 2004, Blanner sent a letter to Affiliated challenging the denial of coverage. (Doc. 125-1 at ¶ 14; Doc. 125-6.) Blanner wrote that he was directed "to provide [Affiliated] with one final opportunity to make payment" and gave Affiliated ten days to make the payment, after which time Lloyd's would "pursue all legal and equitable remedies available to collect the amount due." (Doc. 125-6.)

In February, 2005, Cohen, Romman, and Smith exchanged letters and e-mails.[10] (Doc. 125-7.)

_____

[10]Neither the letters and e-mails themselves nor their contents are included in the record. The letters and e-mails are referenced, however,
(continued...)

- 4 -

On March 2, 2005, Cohen wrote Romman a letter stating that "a settlement conference [was] necessary to facilitate a resolution of [the] claim" and requesting that Romman, Affiliated's experts, and Affiliated's legal counsel attend the conference.  (Id.)

On March 10, 2005, Romman e-mailed Smith and Bern to discuss how best to respond to Cohen's request for a settlement conference.  (Doc. 125-1 at ¶ 15.)  On March 25, 2005, Bern e-mailed Smith and Romman for the same purpose.  (Id.)

On June 24, 2005, Smith wrote Cohen a letter to confirm receipt of letters sent by Cohen on June 15 and June 22, 2005.  (Doc. 127-2.)  In the letter, Smith also explained that, in a previous telephone message, he had "indicated that a portion of the claimed costs are recoverable." (Id.)

On August 11, 2005, Smith wrote a letter to Cohen stating that Affiliated had "completed [its] review of [Cohen's] 14 July 2005 request for an advance payment of $948,630.42."  (Doc. 125-1 at ¶ 16; Doc. 127-3.)  In the letter, Smith stated:

> Until my letter of 10 December 2004, we had not taken a position regarding coverage, much less acknowledged coverage. Prior to that time, we made clear that we were conducting an investigation in order to make our coverage determination.  In my 10 December 2004 letter, we unequivocally denied coverage based upon multiple grounds . . . .

(Doc. 127-3.)  At the end of the letter, Smith offered to issue a final payment of $12,335.88 as an accommodation for recoverable damages owed. (Doc. 125-1 at ¶ 16; Doc. 127-3.)

## Work Product Doctrine

Federal law governs the application of the work product doctrine in this action.  Baker v. Gen. Motors Corp., 209 F.3d 1051, 1054 (8th Cir. 2000).  Under Federal Rule of Civil Procedure 26, a party may not ordinarily discover documents prepared in anticipation of litigation by an opposing party unless the party seeking discovery has a substantial

---

[10](...continued)
in Cohen's March 2, 2005 letter to Romman.  (Doc. 125-7.)

need for the materials and cannot, without undue hardship, obtain the substantial equivalent of the materials by other means.[11]  Id.; Fed. R. Civ. P. 26(b)(3).  The party seeking protection under the work product doctrine bears the burden of establishing that the documents were prepared in anticipation of litigation.  PepsiCo, Inc. v. Baird, Kurtz & Dobson LLP, 305 F.3d 813, 817 (8th Cir. 2002).  If the doctrine is found to apply, the party seeking discovery bears the burden of showing a substantial need for the documents and that it cannot otherwise obtain the substantial equivalent of the materials without undue hardship.  Id.; Baker, 209 F.3d at 1054.


Anticipation of Litigation

Lloyd's argues that the December 10, 2004 denial was only a "preliminary" or "initial" denial and that Affiliated's subsequent request for additional information extended the claim consideration period through August 11, 2005, when Lloyd's issued a "final" denial of the claim.  (Docs. 121, 127.)  Affiliated argues that it "partially" denied the claim as early as June 28, 2004 and that either this or Cohen's hiring of outside counsel on July 14, 2004 marked the beginning of when the parties became adversarial.  (Doc. 125.)

Whether documents were prepared in anticipation of litigation is a factual determination:

> [T]he test should be whether, in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation.  But the converse of this is that even though litigation is already in prospect, there is no work product immunity for documents prepared in the regular course of business rather than for purposes of litigation.

Simon v. G.D. Searle & Co., 816 F.2d 397, 401 (8th Cir. 1987) (citations omitted).  Thus, to be entitled to protection, the documents must have

---

[11]Affiliated does not assert that the e-mails are "opinion work product," i.e. counsel's mental impressions, conclusions, opinions, or legal theories, which would be entitled to "almost absolute immunity."  Baker, 209 F.3d at 1054 (discussing the different standards); Fed. R. Civ. P. 26(b)(3)(B).

been prepared after a "specific threat" of litigation became "palpable." Black v. Pilot Travel Cntrs., LLC, No. CIV. 09-4170-KES, 2011 WL 1828039, at *2 (D.S.D. May 12, 2011).   That litigation was "[m]erely a possibility" is insufficient.   Folk v. State Farm Mut. Auto. Ins. Co., No. 4:10 CV 574 HEA, 2010 WL 3620477, at *2 n.1 (E.D. Mo. Sept. 9, 2010).

In the insurance context, "[a]n insurer's decision to decline coverage is typically the point at which the ordinary course of business ends and the anticipation of litigation begins."   Scottrade, Inc. v. The St. Paul Mercury Ins. Co., No. 4:09 CV 1855 SNLJ, 2011 WL 572455, at *5 (E.D. Mo. Feb. 15, 2011).   This is not a "hard line approach," however, as the "unique factual context of the given problem" varies among cases. Med. Protective Co. v. Bubenik, No. 4:06 CV 1639 ERW, 2007 WL 3026939, at *3 (E.D. Mo. Oct. 15, 2007).

The record is clear that the parties became adversarial no later than December 10, 2004, when Affiliated officially denied the claim. (Doc. 125-5.)  As Smith explained in his August 11, 2005 letter, prior to December 10, 2004, Affiliated "had not taken a position regarding coverage," but on December 10, 2004, Affiliated "unequivocally denied coverage based upon multiple grounds."  (Doc. 127-3.)

The parties' actions prior to December 10, 2004, however, indicate that the parties became adversarial even before the official denial.

On July 14, 2004, Cohen informed Smith that he had hired outside counsel, Joseph Blanner, to assist Lloyd's in asserting its claim. (Doc. 125-1 at ¶¶ 6, 7.)  The court's in camera review confirmed that Smith wrote the July 14, 2004 e-mail to Romman, Bern, and Mishara in response to Cohen's hiring of outside counsel.  The firmness of Cohen's intent to litigate coverage was later reflected in Blanner's November 9, 2004 letter, which disputed coverage and threatened litigation. (Doc. 125-4); see Scottrade, 2011 WL 572455, at *5 (noting that the plaintiff had hired outside counsel prior to the denial of the insurance claim); Bubenik, 2007 WL 3026939, at *4 ("While the retention of outside counsel is not dispositive of when litigation is anticipated, the Court finds that in the case at bar it indicates [the plaintiff]'s intention to challenge coverage, and the beginning of an adversary relationship between the parties.").

- 7 -

In his sworn declaration, Smith testified that "from on or about July 14, 2004 forward, [he] held the belief that [Lloyd's] was more likely than not to litigate its dispute over Affiliated's position."[12] (Doc. 125-1 at ¶ 8); see State Auto Prop. & Cas. Ins. Co. v. PW Shoe Lofts, LP, No. 4:10 CV 1951 AGF, 2011 WL 2174856, at *2-3 (E.D. Mo. June 3, 2011) (finding that the expert was retained in anticipation of litigation where, even thought the claim had not yet been denied, the insurer was aware of the potential of litigation).

Moreover, although the claim was not formally denied until December 10, 2004, Affiliated communicated its coverage position as early as June 28, 2004.  (Doc. 125-1 at ¶ 5; 125-2); compared to, e.g., Martin v. Safeco Ins. Co. of Am., No. 4:10 CV 1027 AGF, 2010 WL 4278856, at *1 (E.D. Mo. Oct. 25, 2010) (noting that the insurer "ha[d] not argued that at the time [the insured] first made a claim against [it], [it] intended to deny the claim"); McConnell v. Farmers Ins. Co., Inc., No. 07-4180-CV-C-NKL, 2008 WL 510392, at *2 (W.D. Mo. Feb. 25, 2008) (same).  It was Affiliated's June 28, 2004 coverage position that led Cohen to hire outside counsel, which in turn led Smith to contact Affiliated's in-house counsel.  E.g., PW Shoe Lofts, 2011 WL 2174856, at *2-3.

Based on the foregoing, the court concludes that each of the e-mails was created in anticipation of litigation rather than in the ordinary course of business.  Thus, Lloyd's must show a substantial need for the e-mails and an inability to obtain their substantial equivalent without undue hardship in order to compel their production.

Substantial Need and Undue Hardship

Lloyd's argues that it has a substantial need for the e-mails because the e-mails reveal Affiliated's knowledge and intentions during

_____

[12]Although Smith testified in his deposition that he did not recall when the claim became "contentious," this does not necessarily undermine his declaration.  To the extent Smith exhibited greater knowledge of the facts in his declaration than in his deposition, Smith may have had a more refreshed memory of the relevant timeline during his declaration than during his deposition.  In any event, as discussed above, the parties' communications and actions also reflect their adversarial relationship.

the investigation of the claim, which Lloyd's argues are directly at issue in Count II (vexatious refusal to pay).[13]  Lloyd's argues that it cannot obtain the substantial equivalent of the e-mails because the e-mails are the only documents that "demonstrate the contemporaneous thoughts and positions of Affiliated." (Docs. 121, 127.)  Affiliated argues that Lloyd's can obtain the substantial equivalent of the e-mails without undue hardship through depositions of Smith and Romman, and that Lloyd's already possesses all letters communicating Affiliated's coverage decisions and reasoning.  (Doc. 125.)

Often, "there is a substantial need for discovery of a claims file as it relates to a vexatious refusal to pay claim." McConnell, 2008 WL 510392, at *3; accord Logan v. Commercial Union Ins. Co., 96 F.3d 971, 977 (7th Cir. 1996) (recognizing that "allowing a plaintiff to overcome an insurer's work product privilege may be particularly appropriate in an action for bad faith, in light of the insurer's virtual monopoly over the evidence required to support an action"); Henderlong v. Allstate Ins. Co., Civil Action No. 08-cv-01377-CMA-MEH, 2009 WL 82493, at *2 (D. Colo. Jan. 13, 2009) ("The case for discoverability is much stronger when a bad faith claim is alleged and when the parties involved in the lawsuit are insured and insurer.").  The substantial need arises because "the strategy, mental impressions[,] and opinion of the insurer's agents concerning the handling of the claim are directly at issue." Holmgren v. State Farm Mut. Auto. Ins. Co., 976 F.2d 573, 577 (9th Cir. 1992).

Pleading a vexatious refusal to pay claim does not, *ipso facto*, create a substantial need for an insurer's internal documents.  Logan, 96 F.3d at 977 ("[A] mere allegation of bad faith is insufficient to overcome the work product privilege.").  Instead, "[t]he plaintiff must demonstrate some likelihood or probability that the documents sought may contain evidence of bad faith." Id.  The required showing is "not a high hurdle," given that the plaintiff can only speculate as to the documents' contents. Id.

Where, as here, an insured raises a bad faith claim against an insurer, by an *in camera* examination of the documents the court can

_____

[13]See (Doc. 73 at ¶¶ 38-46.)

evaluate the possibility that the documents contain evidence of bad faith. Id.; Henderlong, 2009 WL 82493, at *2; Bishelli v. State Farm Mut. Auto. Ins. Co., Civil Action No. 07-cv-00385-WYD-MEH, 2008 WL 280850, at *2 (D. Colo. Jan. 31, 2008).

Affiliated does not argue that the e-mails are not relevant to any claims or defenses in this action. Fed. R. Civ. P. 26(b)(1). Regardless, after conducting an *in camera* review, the court determines that the e-mails may be relevant to Lloyd's vexatious refusal to pay claim. See Logan, 96 F.3d at 977 (noting that there need be only "the possibility, not the certainty" that the documents contain evidence of bad faith in order for an insured to have a substantial need for them in establishing a vexatious refusal to pay claim); accord Henderlong, 2009 WL 82493, at *2.

Affiliated argues that Lloyd's has other means to obtain the substantial equivalent of these materials, namely, through depositions of Smith and Romman. "That [the plaintiff] will have the opportunity to depose employees of [the defendant] as well as [the defendant]'s agents does not mean that [the plaintiff] will be able to obtain the substantial equivalent to the documents by other means." Schwarz & Schwarz v. Certain Underwriters at Lloyd's, Civil Action No. 6:07cv00042, 2009 WL 1043929, at *3 n.10 (W.D. Va. Apr. 17, 2009) (internal citation omitted). "To the contrary, these documents will be critical for noticing, preparing for, and guiding any such depositions." Id. During his deposition, Smith was unable to recall a significant amount of information, particularly as it related to the handling of the claim. Compare with EPCO Carbondioxide Prods. Inc. v. St. Paul Travelers Ins. Co., No. 06-1800, 2007 WL 4560363, at *3 (W.D. La. Dec. 21, 2007) ("[D]iscovery of work product will be denied when the requesting party can obtain the desired information via deposition."). Thus, Smith's deposition was not the substantial equivalent of the e-mails. While the deposition of Romman may yield additional information, Smith, not Romman, was the primary claims adjuster assigned to the claim, was included in each of the e-mails, and communicated directly with Cohen regarding coverage.

Moreover, the e-mails may be the best evidence of the claims adjusters' mental impressions and opinions from the time surrounding the denial of the claim.  See St. Paul Reinsurance Co., Ltd. v. Commercial Fin. Corp., 197 F.R.D. 620, 639 (N.D. Iowa 2000) (ordering disclosure of materials in an insurer's claims file despite the potential applicability of the work product doctrine because "[b]oth the timing of, and the determination of a basis for, the denial of coverage are essential facts in a first-party bad faith case").

Therefore, because the e-mails are relevant to the vexatious refusal to pay claim and no adequate, substantial equivalent can be obtained without undue hardship, the work product doctrine does not preclude disclosure of the e-mails.

### Attorney-Client Privilege

Missouri law governs the existence and scope of the attorney-client privilege in this action.   Fed. R. Evid. 501; Baker, 209 F.3d at 1053. In Missouri, the common law attorney-client privilege has been statutorily codified by the General Assembly.   See Mo. Rev. Stat. § 491.060(3).[14]  Generally, unless the privilege is waived, it protects "any professionally-oriented communication between attorney and client regardless of whether it is made in anticipation of litigation or for preparation for trial."   State ex rel. Tillman v. Copeland, 271 S.W.3d 42, 45 (Mo. Ct. App. 2008); accord May Dept. Stores Co. v. Ryan, 699 S.W.2d 134, 136 (Mo. Ct. App. 1985) ("[A]ny professionally oriented communication between attorney and client is absolutely privileged, in

---

[14]The statute states:

The following persons shall be incompetent to testify:

\* \* \*

(3) An attorney, concerning any communication made to the attorney by such attorney's client in that relation, or such attorney's advice thereon, without the consent of such client[.]

Mo. Rev. Stat. § 491.060(3).

the absence of waiver, regardless of the anticipation of litigation."). Any such materials are non-discoverable, even if the opposing party can show a substantial need for the materials and that it would suffer undue hardship in acquiring their substantial equivalent. <u>Tillman</u>, 271 S.W.3d at 45.

To be protected by the attorney-client privilege, "the communication must be made in order to secure legal advice." <u>Id.</u> Including counsel among the recipients of a document does not bring the document within the ambit of the attorney-client privilege; the document must be shared in furtherance of the client's solicitation of legal advice. <u>See Diversified Indus., Inc. v. Meredith</u>, 572 F.2d 596, 609 (8th Cir. 1977) (explaining that "the mere receipt of routine reports by the corporation's counsel will not make the communication privileged" and that such communications are "made for independent reasons"); <u>Monsanto Co. & Monsanto Tech. LLC v. E.I. Du Pont de Nemours & Co.</u>, No. 4:09 CV 686 ERW, 2011 WL 4408184, at *2 (E.D. Mo. Sept. 22, 2011) (noting that the "attorney-client privilege does not cover client communications that relate only business or technical data, where the client is not sharing that information in order to solicit legal advice" (citation omitted)).

After conducting an *in camera* review of the e-mails for which Affiliated asserted protection by the attorney-client privilege in its revised privilege log, the court makes the following conclusions:

<u>(a)   July 14, 2004 e-mail</u>

Paragraph two, sentence two and paragraph three, sentence one are protected by the attorney-client privilege, as they memorialize a conversation with counsel concerning legal advice. The remainder of this e-mail, however, does not concern legal advice or litigation and is thus not protected by the attorney-client privilege.

<u>(f)   November 8, 2004 e-mail</u>

This document is not protected by the attorney-client privilege, because it was sent to counsel for the purpose of keeping counsel advised of the business activities of Affiliated's adjusters Bern and Smith. The attorney-client privilege does not attach to a document forwarded to

- 12 -

counsel for the purpose of keeping counsel advised of business activities. <u>See</u> <u>Diversified Indus.</u>, 572 F.2d at 609; <u>Monsanto</u>, 2011 WL 4408184, at *2.

<u>(g)   December 10, 2004 e-mail</u>

This e-mail is protected in its entirety by the attorney-client privilege because the e-mail reflects communications with in-house counsel for the purpose of obtaining legal advice.

Therefore,

**IT IS HEREBY ORDERED** that the motion of plaintiffs Lloyd's Acceptance Corp. d/b/a Lloyd's Development Co. and Affordable Communities LP to compel production of documents (Doc. 120) is sustained in part, and otherwise denied, in that all the disputed documents shall be produced to plaintiffs not later than April 30, 2012, except:

(1)   paragraph 2, sentence 2, and paragraph 3, sentence 1 of the July 14, 2004 email, described above as (a), which shall be redacted from the document; the balance of the document shall be produced; and

(2)   the December 10, 2004 email, described above as (g), which is protected from production in its entirety.


_____/S/   David D. Noce_____
**UNITED STATES MAGISTRATE JUDGE**

Signed on April 23, 2012.

- 13 -