**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| LLOYD'S ACCEPTANCE CORP. d/b/a | ) | |
| LLOYD'S DEVELOPMENT COMPANY | ) | |
| and AFFORDABLE COMMUNITIES, LP, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 4:05 CV 1934 DDN |
| | ) | |
| AFFILIATED FM INSURANCE COMPANY, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| TRAVELERS PROPERTY CASUALTY | ) | |
| COMPANY OF AMERICA, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM AND ORDER REGARDING EVIDENTIARY MATTERS**

This action is before the court on the several pending evidentiary and discovery motions of plaintiffs Lloyd's Acceptance Corp. and Affordable Communities, LP and defendant Affiliated FM Insurance Company.  (Docs. 176, 178, 183, 185, 187, 189, 192, 194, 196, 213.)  The court heard oral argument on February 27, 2012.

**I.  BACKGROUND**

On August 25, 2005, plaintiffs Lloyd's Acceptance Corp. and Affordable Communities, LP, commenced this action against defendant Affiliated FM Insurance Company  in the Circuit Court of the City of St. Louis.  (Doc. 1-3.)  On October 20, 2005, defendants removed the action to this court pursuant to 28 U.S.C. § 1441 on the basis of diversity jurisdiction.  (Doc. 1.)  On December 13, 2006, the court stayed proceedings in this court pending the resolution of related proceedings in state court.  (Doc. 50.)  On September 15, 2010, plaintiffs filed a third amended complaint and named Travelers Property Casualty Company of America as a defendant.  (Doc. 73.)  On March 22, 2011, the court lifted the stay.  (Doc. 89.)

In their complaint, plaintiffs allege breach of contract and vexatious refusal to pay claims separately against defendants Affiliated FM Insurance and Travelers Property Casualty Company of America.  (Doc. 73.)  Plaintiffs seek actual damages in excess of

$1,400,000, and pre-judgment and post-judgment interest. Plaintiffs also seek statutory damages, costs and attorney fees under Missouri statutes.  (Id.)

Defendant Affiliated FM moves to exclude the report and testimony of plaintiffs' experts Joseph Stabler  (Doc. 176), Thomas Zetlmeisl (Doc. 178), C. Stephen Carr (Doc. 189), and Howard Frank (Doc. 192.)  Defendant Affiliated FM also moves to strike the supplementary report of plaintiffs' expert Akos Swierkiewicz (Doc. 185) and to quash plaintiffs' subpoena and issue a protective order regarding Thomas Pazdera (Doc. 213.)

Plaintiffs move to strike portions of Defendant Affiliated FM's expert Donald Brayer's report (Doc. 183) and to exclude Defendant Affiliated FM's experts Thomas Hoops (Doc. 187), Ronald Creak (Doc. 194), and Matthew O'Leary (Doc. 196.)

## II.  STANDARD FOR EXPERT TESTIMONY

Federal Rule of Evidence 702 provides that a court may permit opinion testimony from an expert only if (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue, (b) the testimony is based upon sufficient facts or data, (c) the testimony is the product of reliable principles and methods, and (d) the expert has applied the principles and methods reliably to the facts of the case.  Fed. R. Evid. 702.  Trial courts act as gatekeepers, ensuring that expert testimony is both relevant and reliable.  Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 589 (1993).  "The proponent of the expert testimony must prove its admissibility by a preponderance of the evidence."  Lauzon v. Senco Prods., Inc., 270 F.3d 681, 686 (8th Cir. 2001).  Courts have "broad discretion" in determining whether an expert's testimony is admissible.  Weisgram v. Marley Co., 169 F.3d 514, 518 (8th Cir. 1999).

The Supreme Court has articulated factors for evaluation of the reliability of expert testimony: whether the theory or technique (1) can be and has been tested, (2) has been subjected to peer review and publication, (3) has a known or potential rate of error, and (4) has gained general acceptance in the relevant community.  Daubert, 509 U.S. at 593–94.  Other relevant factors include: "whether the expertise was developed for litigation or naturally flowed from the expert's research; whether the proposed expert ruled out other alternative explanations; and whether the proposed expert sufficiently connected the proposed testimony with the facts of the case."  Lauzon, 270 F.3d at 687. "Regardless of what factors are evaluated, the main inquiry is whether the proffered expert's testimony is sufficiently reliable."  First Union Nat. Bank v. Benham, 423 F.3d 855, 861 (8th Cir. 2005). "As a general rule, the factual basis of an expert opinion goes to the credibility of the

testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination.   Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded." Id. at 862 (citation omitted).

### III.  DEFENDANT'S MOTIONS

### A. Motion to Exclude the Expert Report and Testimony of Joseph Stabler (Doc. 176)

Defendant Affiliated FM moves to exclude the report and testimony of plaintiffs' expert Joseph Stabler.

In January 2004, plaintiffs hired Joseph Stabler, an elevator consultant with thirty-six years of elevator service and repair experience, to inspect the elevator system in their Jefferson Arms apartment building.  To prepare for expert disclosures required by Fed. R. Civ. P. 26(a)(2), plaintiffs requested that Stabler conduct an analysis and document his opinions on the cause of elevator system failure and the cost of repair.  Stabler based his report on his visual inspection and testing of the elevator system failure in January 2004 and on several documents, including maintenance tickets, deposition transcripts of other witnesses, and other elevator system inspection reports.  (Doc. 177-1 at 1.)

In a written report, Stabler stated the following:

2.20 During an October 14, 2004 site meeting between [defendant] representatives, Mr. Cohen[, the building owner,] and me, [defendant] was advised by me of the cable rouge and ferrite intrusion and its effect on the elevator equipment, and had every opportunity to examine and document the building and equipment conditions.   Following the examination, [defendant] took the position that irrespective of passenger (tenant) safety, the suspension ropes should be replaced and the elevator control equipment should be cleaned without any disassembly, testing, reassembly, adjustment or replacement.   As [defendant] had every opportunity to examine and document the building and equipment positions before the effective date of the policy and failed to do so, I conclude (as I did in my November 3, 2004, letter to Mr. Cohen) that the context of [defendant]'s response in this matter was grievous and reckless, as the damage caused by the rouge and ferrite intrusion at that time could not be corrected or reversed by the proposed cleaning and replacement of the suspension cables.

* * *

4.5 In my opinion, [defendant] reasonably knew or should have known that large quantities of red iron oxide (rouge) present a health hazard to building occupants, visitors and others; and that, such an advance [sic] case of cable rouging would likely compromise and irreparably damage the equipment and cause expensive equipment repair, replacement or modernization.

(Id. at 9-10.)

Defendant argues that Stabler is insufficiently qualified to opine on whether red rouge is a health hazard and further questions the relevance of the statement because the health consequences of red rouge are not at issue in this case.  Defendant also contests the statement that "[defendant]'s response in this matter was grievous and reckless," maintaining that the statement invades the province of the court and jury and that Stabler is not qualified to opine about claim handling.  Plaintiffs respond that Stabler made the statements in the context of describing the reasonableness of defendant's proposed repairs to the system and that Stabler is amply qualified to opine on these topics.

Fed. R. Evid. 702 requires that "the area of the witness's competence [match] the subject matter of the witness's testimony."  Robinson v. GEICO Gen. Ins. Co., 447 F.3d 1096, 1101 (8th Cir. 2006).  Stabler's experience in the elevator service industry is extensive, but he professes no expertise regarding the handling of insurance claims.  (Doc. 177 at 13-16.)  Therefore, Stabler is qualified to opine on whether an elevator repair is reasonable.  However, he is not qualified to opine on the adequacy of defendant's response to the insurance claim, and such testimony is excluded.

Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence; and [] the fact is of consequence in determining the action."  Fed. R. Evid. 401.  To recover for vexatious refusal to pay under Mo. Rev. Stat. § 375.420, "a party must show that the 'insurer's refusal to pay was willful and without reasonable cause as it would appear to a reasonable and prudent person.'"  Thornburgh Insulation, Inc. v. J.W. Terrill, Inc., 236 S.W.3d 651, 657 (Mo. Ct. App. 2007) (quoting Smith ex rel. Stephan v. AF & L Ins. Co., 147 S.W.3d 767, 778 (Mo. Ct. App.2004)).  The fact that red rouge is hazardous does not itself conclusively prove that defendant's refusal to pay was willful and without reasonable cause.  However, the fact that red rouge has a negative effect on health makes the fact that defendant knew about its effect on health more likely, which would provide support for the element that defendant's refusal to pay was without reasonable cause.

Stabler relied on Pestell material safety data sheet to conclude that red rouge presents a health hazard.  (Doc. 177-1 at 8.)  Fed. R. Evid. 703 states  that "[a]n expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed."  Fed. R. Evid. 703.  To the extent that the factual basis is faulty, "it is up to the opposing party to examine the factual basis for the opinion in cross-examination."  Larson v. Kempker, 414 F.3d 936, 941 (8th Cir. 2005).  Further, although

-4-

Stabler claims no medical background, whether substances encountered in his field generally present a danger to health is within his expertise.

Stabler also opined that red rouge caused nearly all repairs performed by Midwest Elevator from July 2004 to June 2006 on the basis of his analysis of 158 service tickets. (Doc. 177-1 at 8, 28-31.)  For plaintiffs' related litigation with Archway Elevators, Stabler classified the service tickets into the categories of "General Maintenance," "Negligent Maintenance," or "Electrical Breakdown."  (Doc. 177-2 at 19, 29.)  For the instant case, Stabler reclassified all "Negligent Maintenance" and "Electrical Breakdown" service tickets into "Repairs Necessitated by Rouge."  (Id. at 29.)  Defendant argues that Stabler's opinion is speculation and has no basis in reliable scientific or technical methodology.  Specifically, defendant argues that Stabler had an insufficient basis for the reliable classification of service calls, that he failed to rule out other possible causes of service calls, and that he admitted to several mistakes regarding his classification.

In his deposition, Stabler testified that with his "Negligent Maintenance" category, he attempted to identify the service calls resulting from Archway Elevator and its failure to correct the red rouge.  (Id. at 19.)  The category of "Electrical Breakdown" resulted from the fact that he suspected many of the tickets represented calls due to negligent maintenance but that many of the tickets contained insufficient data for him to classify them as "Negligent Maintenance."  (Id. at 25.)  However, sometime later, Stabler concluded that red rouge and the failure to repair caused these electrical breakdowns.  (Id.)  Stabler reported that after he identified the pervasiveness of the red rouge and the resulting effects, he did no further testing to rule out other causes.  (Id. at 14.)  Although he conceded the possibility of other causes, including carbon buildup and wear and tear, Stabler's opinion remained that red rouge caused most of the service calls.  (Id. at 12, 15.)  Stabler erroneously classified service calls caused by power outages and falling water pipes as "Repairs Necessitated by Rouge".  (Id. at 36-38.)  Stabler also erroneously classified a repair that occurred after the discovery of a pick up roller disconnected from a door as an "Electrical Breakdown."  (Id. at 29.)  He attributed the mistake to misreading the ticket and opined that red rouge caused the repair.  (Id. at 29-30.)  Stabler also classified a single repair caused by an bent elevator component as both "Electrical Breakdown" and "Repair Necessitated by Rouge".  (Id. at 37.)  He attributed the mistake to misreading the ticket as "burnt out" rather than "bent out."  (Id.)

Courts have permitted other experts to offer causation opinions relying on similar data.  See e.g. Jones v. Otis Elevator Co., 861 F.2d 655, 662-63 (11th Cir. 1988) (allowing expert testimony on the basis of inspection and review of elevator maintenance records);

Kirkland v. Marriott Int'l, Inc., 416 F. Supp. 2d 480, 485-88 (E.D. La. 2006) (allowing expert testimony on the basis of inspection, review of witness statements and depositions, and elevator maintenance records and inspection tags).  Although the failure to exclude other possible causes is a factor for consideration, the Eighth Circuit has warned against taking the factor to "a quixotic extreme," and noted that the factor's significance most commonly arose in cases concerning medical diagnoses.  Lauzon v. Senco Products, Inc., 270 F.3d 681, 693 (8th Cir. 2001).  The possibility of other causes typically affects the weight but not the admissibility of expert testimony.  Id. at 694.  Stabler's classification errors also go to the weight of his testimony.

In his written report, Stabler opined that the initial manifestation of the red rouge occurred sometime before October 14, 2003.  (Doc. 177-1 at 7.)  In his deposition, Stabler opined more specifically that a service ticket from April 23, 2002 first indicated the presence of red rouge.  (Doc. 177-2 at 46.)  Defendant argues that the opinion is speculation.

Stabler arrived at this conclusion on the basis of his inspection and examination of tickets.  One ticket documented a service call regarding a burnt out motor on April 3, 2002 and did not mention red rouge.  (Id. at 45.)  Stabler stated that for such service calls, if red rouge had manifested, it would likely be documented and concluded that red rouge had not manifested prior to that date.  (Id. at 46.)  A ticket dated April 23, 2002 indicated the mounting of cable brushes.  (Id.)  Stabler opined that cable brushes indicated red rouge, relying on his knowledge that although cleaning elevator cables is general maintenance, cleaning with cable brushes is particularly abrasive and typically used to combat red rouge and relying on the deposition testimony of Jerry Follen, Archway Elevator's president who testified that the brushes were installed to combat the red rouge.  (Id.)  On October 4 and December 23, 2003, service tickets documented that Archway Elevator had again used the cable brushes and cleaned and vacuumed the elevator room.  (Doc. 177-1 at 7.)  On January 14, 2004, during his inspection, Stabler saw a vacuum cleaner full of red rouge particles.  (Id.)

"[E]xpert opinion should be excluded as too speculative only where it is "so fundamentally unsupported that it can offer no assistance to the jury."  McKnight By & Through Ludwig v. Johnson Controls, Inc., 36 F.3d 1396, 1408 (8th Cir. 1994).  "Likewise, an expert may give opinions if there are sufficient facts already in evidence to take the opinion out of the realm of mere speculation or guesswork."  Id.  The court finds sufficient the evidence supporting Stabler's opinion.  Although defendant points to deposition statements made by other witnesses indicating earlier manifestation of red rouge, the

contradictory statements go to the weight of Stabler's opinion rather than to its admissibility.

Stabler also offered the following opinions in his written report:

4.7 . . . I am further of the opinion, that until November 21, 2003, Mr. Cohen[, the building owner,] and [defendant Affordable Communities] had no prior knowledge that elevator 2 was unsafe, and before my February 18, 2004 report, had no reason to suspect that rouge or ferrite intrusion had compromised and irreparably damaged the elevators and their subsystems.

4.8 I am finally of the opinion that unless a person has sufficient technical expertise, that he or she would not recognize or appreciate the type of events that the elevators experienced due to rouge or ferrite intrusion until the elevator systems failed.

(Doc. 177-1 at 11.)

Defendant argues that such opinions would not be helpful to a jury. Defendant further argues that although plaintiffs' knowledge is relevant to the loss in progress and fortuity affirmative defenses, the specific relevant issue is the knowledge of the existence of elevator malfunction rather than its specific cause. According to defendant, Stabler's opinion about Cohen's knowledge is also irrelevant due to agency principles of imputed knowledge. Defendant further contends that Stabler's opinions ignore the testimony of plaintiffs' employees that they noticed problems with the elevators as early as 1996.

"The touchstone for the admissibility of expert testimony is whether it will assist or be helpful to the trier of fact." McKnight, 36 F.3d at 1408. Federal Rule of Evidence 704(a) provides that expert evidence is not inadmissible merely because it embraces an ultimate issue to be decided by the jury. However, if the subject matter is within the jury's knowledge or experience, the expert testimony remains subject to exclusion "because the testimony does not then meet the helpfulness criterion of Rule 702." United States v. Arenal, 768 F.2d 263, 269 (8th Cir.1985). "Opinions that merely tell the jury what result to reach are not admissible." Lee v. Andersen, 616 F.3d 803, 809 (8th Cir. 2010).

The court finds that Stabler's qualifications allow him to diagnose problems that less qualified individuals are unlikely to recognize. The notion that Stabler can identify in the abstract the types of problems less qualified individuals are unlikely to recognize based upon his substantial expertise is entirely plausible. Further, such identification itself requires specialized knowledge beyond the ken of a layperson. However, Stabler's expert qualifications do not extend to what specific individuals know or should know. Accordingly, the above-quoted portions of Stabler's report at paragraph 4.7 must be excluded.

Although irrelevant evidence is inadmissible, defendant's arguments regarding relevancy lack merit.  For example, the fact that an expert does not know that red rouge caused an elevator malfunction, makes the individual's lack of knowledge regarding the elevator malfunction more likely, which defendant concedes is a material issue, even though it is not conclusive proof.

Accordingly, defendant's motion to exclude the expert testimony and report of Joseph Stabler is denied in part and granted in part.

**B. Motion to Exclude Expert Report and Testimony of  Thomas Zetlmeisl (Doc. 178)**

Defendant moves to exclude the expert testimony and report of Thomas Zetlmeisl. Plaintiffs retained Zetlmeisl, an accountant, to calculate rental income lost by plaintiffs due to the failure of the elevator systems at the Jefferson Arms apartment building.  (Doc. 179-1 at 3.)  Zetlmeisl concluded that the present value of plaintiffs' lost income will be $1.8 million on July 9, 2012, the then expected date of trial.  (Id.)

According to Zetlmeisl's report, the relevant period began on January 2004, one month after an elevator had been removed from service, and ended on July 19, 2006, the date plaintiff sold the Jefferson Arms apartment building.  (Id. at 4, 12.)  Zetlmeisl compared sets of data including the Jefferson Arms vacancy rates, Midwest regional vacancy rates from the National Apartment Association, and St. Louis vacancy rates. Zetlmeisl first compared the Midwest regional vacancy rates with the St. Louis vacancy rates and found that the two rates correlated.  (Id. at 5.)  He then decided to compare solely the regional vacancy rates to the Jefferson Arms rates because the regional vacancy rates included quarterly data and because it used U.S. Census data, which he found particularly reliable.  (Id.; Doc. 222-4 at 2.)  In his comparison of the regional vacancy rates and the Jefferson Arms rates, he found that from 2001 to 2004, the two rates trended closely; vacancy rates averaged 10.2% regionally, and Jefferson Arms averaged an 11.1% vacancy rate.  (Doc. 179-1 at 5.)  However, Zetlmeisl noted significant discrepancies between the regional and Jefferson Arms vacancy rates from 2003 to July 19, 2006.  (Id. at 5.)  He then used the information to project what the Jefferson Arms vacancy rates would have been absent the elevator failure.  (Id.)

Zetlmeisl also noted a discrepancy between regional and Jefferson Arms per unit rental rates.  (Id.)  He projected per unit rates based on the regional annualized growth rate and the rates charged at Jefferson Arms.  (Id.)  He concluded that the actual per unit rental rate was on average 15% lower than the projected per unit rate.  (Id.)

Zetlmeisl used the available data to project the rental income lost from vacancy and lower rental rates.  (Id. at 12.)  He then compared the projected rental income to the actual rental income.  (Id.)  With consideration for the expected trial date, he discounted for present value and applied Missouri's statutory prejudgment interest rate for an estimate of $1.8 million in lost rental income.  (Id. at 7.)

Defendant argues that Zetlmeisl used unreliable methodology to calculate plaintiffs' lost rental income.  Specifically, defendant argues that the Midwest vacancy rate data was an inappropriate yardstick because the data bears no relation to the Jefferson Arms rates prior to 2004 and because Zetlmeisl offers no explanation concerning the similarities between the rental markets of the Midwest region and of the St. Louis area or Jefferson Arms.

Zetlmeisl used the yardstick method of calculating lost profits.  The yardstick method uses the profits of comparable businesses to estimate the profits lost by a particular business.  Victory Records, Inc. v. Virgin Records Am., Inc., 2011 WL 382743, *1 (N.D. Ill. 2011).  "Under the 'yardstick' test, 'the business used as a standard must be as nearly identical to the plaintiff's as possible.'"  R & R Int'l, Inc. v. Manzen, LLC, 2010 WL 3605234, *10 (S.D. Fla. 2010) (internal citations omitted).  "[W]hile damages may not be determined by mere speculation or guess, it will be enough if the evidence show[s] the extent of the damages as a matter of just and reasonable inference." Id.  "The proof may be indirect and it may include estimates based on assumptions, so long as the assumptions rest on adequate data." Id. at *9 (internal citations omitted).

Zetlmeisl demonstrated a correlation between the regional data and the Jefferson Arms data compiled for the years 2001 to 2003.  (Doc. 179-1 at 5.)  Essentially, the demonstrated correlation prior to 2004 shows that, prior to 2004, the rental business of Jefferson Arms compared similarly to businesses in the Midwest region.  Further, Jefferson Arms is within the Midwest region, and thus, affected by some of the same factors that affect the region.  (Id. at 6 n.18.)  Zetlmeisl testified that his analysis accounted for changes in the rental market regionally and within the St. Louis area as well as the unique factors of the Jefferson Arms building.  Specifically, his analysis projects the lost rental income using both regional data, which correlated with the St. Louis area data and reflected the regional market changes, and Jefferson Arms data, which reflected the particular characteristics of the apartment building as they were prior to 2004.  (Doc. 179-2 at 11, 27.)  Therefore, defendant's argument that regional data bears no relation to the Jefferson Arms data is without merit.

Further, the court finds insignificant the deviations of the Jefferson Arms data from the regional data prior to 2004.  Specifically, the Jefferson Arms vacancy rates oscillate between 6% to 18% from 2001 to 2004, and the regional vacancy rates steadily rise from about 9% to 12%.  (Id. at 5.)  Although defendant argues that comparison of the rates is misleading in light of such deviations, single sets of data often fluctuate more than the averages of several datasets.

Defendant further argues that Zetlmeisl's report and testimony are unreliable because he failed to rule out other possible causes, including availability of additional apartment units, change of leasing agent, business practices of local competitors, changing target demographics from senior citizens to young professionals, medical interns, and low income tenants, and various other reasons articulated by former tenants in their exit interviews.

Zetlmeisl bases his opinion that the elevators caused the loss of rental income largely on the fact that prior to 2004, the regional rates and Jefferson Arms rates correlated fairly closely, but shortly after the elevator system failure, the rates began to deviate significantly.  (Doc. 179-2 at 9.)  Zetlmeisl claims no expertise in real estate, and therefore, may not opine on the cause of the loss of rental income.  However, damages experts are permitted to "assume that the defendant's alleged misdeeds caused the plaintiff's loss."  Victory Records, Inc., 2011 WL 382743 at *4-5; see Tuf Racing Products, Inc. v. Am. Suzuki Motor Corp., 223 F.3d 585, 591 (7th Cir. 2000).

Accordingly, defendant's motion to exclude Zetlmeisl's expert testimony and report is sustained in part and denied in part.

**C. Motion to Exclude the Expert Reports and Testimony of C. Stephen Carr (Doc. 189) and Howard Frank (Doc. 192)**

Defendant Affiliated FM moves to exclude the expert reports and testimony of plaintiffs' experts C. Stephen Carr and Howard Frank.

On November 11, 2011, plaintiffs disclosed Stabler as an elevator expert.  On February 16, 2012, defendant disclosed Ronald Creak as an elevator expert and the Schaefer Engineering firm as electrical and mechanical engineering experts, both of whom dispute and contradict the opinions of Stabler.  Thereafter, on July 3, 2012, plaintiffs disclosed Carr and Frank as elevator experts to rebut the opinions of Creak and the Schaefer firm.

-10-

Defendant first argues that plaintiffs' disclosure of Carr and Frank as expert witnesses was untimely and that their expert reports and testimony should be excluded. Specifically, defendant relies on Fed. R. Civ. P. 26(a)(2)(D), which states:

> Time to Disclose Expert Testimony: A party must make these disclosures at the times and in the sequence that the court orders. Absent a stipulation or a court order, the disclosures must be made:
>> (i) at least 90 days before the date set for trial or for the case to be ready for trial; or
>> (ii) if the evidence is intended solely to contradict or rebut evidence on the same subject matter identified by another party under Rule 26(a)(2)(B) or (C), within 30 days after the other party's disclosure.

Fed. R. Civ. P. 26(a)(2)(D).

Defendant argues that Carr and Frank do not qualify as rebuttal experts and that plaintiffs should have disclosed them as experts at the same time that plaintiffs disclosed Stabler as an expert. Alternatively, defendant argues that plaintiff failed to disclose Carr and Frank as a rebuttal within 30 days of defendant's disclosure of Creak and Schaefer as experts.

Defendant states that the last deadline set for expert disclosure was March 16, 2012. (Doc. 110.) However, the court finds that the last deadline set was August 31, 2012. (Doc. 154.) Plaintiffs disclosed on July 3, 2012. Therefore, plaintiffs disclosed Carr and Frank as experts prior to the deadline set forth by court order and did not violate Fed. R. Civ. P. 26(a)(2)(D).

Defendant also argues that Carr and Frank serve only to bolster the testimony of plaintiffs' expert Stabler and thus, do not qualify as rebuttal experts. However, the cases cited by defendant exclude similar testimony in the context of determining whether parties were permitted to designate rebuttal experts under the greater allotment of time conferred by Fed. R. Civ. P. 26(a)(2)(D)(ii). See Krueger v. Wyeth, Inc., 2012 WL 3637276 (S.D. Cal. 2012); D.G. v. Henry, 2011 WL 2881461 (N.D. Okla. 2011). Plaintiffs need not rely on Fed. R. Civ. P. 26(a)(2)(D)(ii).

Defendant next argues that Carr's opinions are unreliable because he relied solely on Stabler's conclusions. Defendant is particularly concerned that Carr did not personally analyze Midwest Elevator's invoices and service tickets.

Expert opinions ordinarily cannot be based upon the opinions of others whether those opinions are in evidence or not. Am. Key Corp. v. Cole Nat. Corp., 762 F.2d 1569, 1580 (11th Cir. 1985). However, "an expert can appropriately rely on the opinions of others if other evidence supports his opinion and the record demonstrates that the expert

conducted an independent evaluation of that evidence."   Cholakyan v. Mercedes-Benz, USA, LLC, 281 F.R.D. 534, 544 (C.D. Cal. 2012)

According to Carr's report, he relied on his forty-nine years of experience with engineering and elevators along with seventeen other sources including Stabler's report, photographs taken by Stabler, Creek and the Schaefer firm's reports, and the depositions of seven other witnesses.  (Doc. 191-1 at 4-5.)  Carr further personally examined the elevator room and performed tests on the red rouge.  (Doc. 191-5 at 15.)  Although this examination took place after he prepared his report, Carr testified that the examination did not change his opinions, and he stated his intention to augment the report with observations made therefrom.  (Id. at 5.)

Further, although defendant states that Carr's opinion relied solely on Stabler's conclusions, the portions of Carr's report cited by defendant state that Carr formed his opinions as a result of Stabler's descriptions and corroborating photographs.  For example, defendant cites Carr's opinion that "[c]onsidering what Stabler observed – a machine room 10 millimeters deep in rouge – it is more likely than not that many of the problems analyzed by Creek that occurred after red rouge developed were the result of red rouge intrusion." (Doc. 191-1 at 8.)  But, given that Carr personally observed the elevator room, reviewed Stabler's report and photographs, and read Creek's report, this opinion is sufficiently supported by evidence other than Stabler's opinion.  Additionally, despite defendant's contention that Carr is not a rebuttal expert, many of Carr's opinions draw upon his experience to directly contradict the statements of defendant's experts and need not be subjected to the reliability factors articulated in Daubert and Lauzon.  See Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 150 (1999) ("[T]he factors identified in Daubert may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony.").

In short, the record indicates that Carr did not rely solely on Stabler's opinion but conducted an independent evaluation of the evidence before arriving at his conclusions. Defendant's argument that Carr's opinion is unreliable is without merit.

Finally, defendant argues that Carr's report and testimony will not assist the jury. Defendant relies on portions of Carr's report that discuss the internal contradictions and methodological faults of defendant's experts.

"Rule 702 further requires that the evidence or testimony 'assist the trier of fact to understand the evidence or to determine a fact in issue.' This condition goes primarily to relevance.  Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." Daubert, 509 U.S. at 591 (internal citations omitted).

Although many of the errors discussed in Carr's report could be raised through cross-examination, the sole purpose of Carr's designation as an expert is to rebut the opinions of defendant's experts.  Krueger v. Wyeth, Inc., 2012 WL 3637276, *4 (S.D. Cal. 2012) ("Rebuttal is for the purpose of contradicting an opinion.").  Defendant relies on several cases excluding expert testimony regarding the conduct of a reasonable person, which is generally unhelpful to juries.  See e.g., Hartman v. Hallmark Cards, Inc., 833 F.2d 117, 120 (8th Cir. 2010); U.S. v. Whitfield, 31 F.3d 747, 749 (8th Cir. 1994).  In contrast to the experts excluded in the cases cited by defendant, Carr, drawing upon his substantial expertise, performed an independent evaluation of the evidence to support Stabler's opinion and rebut defendant's experts and could testify to that effect to the jury. Therefore, defendant's argument that Carr's report and testimony will not assist the jury is without merit.

Accordingly, defendant's motions to exclude the expert reports and testimony of Carr and Franks are denied.


**D. Motion to Strike the Revised Report of Expert Akos Swierkiewicz (Doc. 185)**

Defendant Affiliated FM moves to strike the revised report of plaintiffs' expert Akos Swierkiewicz.

On November 11, 2011, plaintiffs disclosed Swierkiewicz as an insurance expert. Thereafter, as late as June 2012, plaintiffs received from defendant several documents and deposed witnesses including the primary adjuster of plaintiffs' insurance claims, the primary adjuster's supervisor, and defendant's insurance expert, Donald Brayer.  On July 2, 2012, defendant received Swierkiewicz's revised report, which considered the subsequent discovery.

Defendant first argues that the revised report is untimely because it does not qualify as a supplemental report under Fed. R. Civ. P. 26(e)(2) and because it does not qualify as a rebuttal report under Fed. R. Civ. P. 26(a)(2)(D)(ii).

Generally, Fed. R. Civ. P. 26(a)(2)(D)(i) states that absent court order or stipulation, expert disclosures must be made at least ninety days before the trial date.  However, Fed. R. Civ. P. 26(e)(2) establishes a duty to supplement expert reports and depositions and states that supplementary information must be disclosed by the time pretrial disclosures are due.  Further, Fed. R. Civ. P. 26(a)(2)(D)(ii) provides that disclosure of rebuttal experts is permitted within thirty days of disclosure of the expert to be rebutted.

As stated above, the applicable deadline for expert disclosures was August 31, 2012.  (Doc. 154.)  Therefore, the production of Swierkiewicz's revised report was timely

regardless of its qualification as a supplemental or rebuttal report.   Accordingly, defendant's argument is without merit.

Defendant next argues that Swierkiewicz's revised report offers opinions on subjects improper for expert testimony.  Specifically, defendant contends that the opinions regarding defendant's compliance with insurance regulations and legal opinions and inconsistencies in the report of expert Donald Brayer will be unhelpful to the jury.

"As a general rule, 'questions of law are the subject of the court's instructions and not the subject of expert testimony.'"  United States v. Klaphake, 64 F.3d 435, 438 (8th Cir. 1995).  The Eighth Circuit has applied this rule to expert testimony regarding whether parties violated regulatory law.  S. Pine Helicopters, Inc. v. Phoenix Aviation Managers, Inc., 320 F.3d 838, 841 (8th Cir. 2003).  However, the Eighth Circuit recognizes the relevance of expert testimony regarding industry practices and standards.  Id.  Further, the Eighth Circuit has upheld the admission of opinion testimony regarding whether an insurance company breached or vexatiously refused to pay.  Cedar Hill Hardware & Const. Supply, Inc. v. Ins. Corp. of Hannover, 563 F.3d 329, 340, 343-44 (8th Cir. 2009); see also McElgunn v. CUNA Mut. Group, 2009 WL 1578489, *6 (D.S.D. 2009) (permitting testimony regarding insurance law and defendant compliance); Amica Mut. Ins. Co. v. Willard, 2009 WL 2982902, *5 (E.D. Mo. 2009) (permitting testimony regarding defendant compliance with insurance law).

Defendant maintains that the expert testimony regarding industry practice and standards is admissible only due to the vexatious refusal to pay claims and suggests that the trial should be bifurcated to allow for the separate adjudication of the breach of contract and vexatious refusal to pay claims.  However, such concerns are more appropriately raised in a motion to bifurcate.

Regarding Swierkiewicz's statements on the inconsistencies in Brayer's report, plaintiffs intend to use Swierkiewicz as an expert, in part, to rebut Brayer's opinions.  As stated above, the purpose of a rebuttal expert is to contradict another expert's opinions.

Finally, regarding Swierkiewicz's statements on whether portions of Brayer's report constitute unsupported legal conclusions, the issue of whether expert testimony constitutes legal conclusions is squarely within the province of the court and is itself an inadmissible legal conclusion.  Lauzon, 270 F.3d at 686; Klaphake, 64 F.3d at 438.  However, much of Swierkiewicz's report cited by defendant includes rebuttal of Brayer's opinion by reference to other statements made by Brayer and various other facts of the case.  (Doc. 188-2 at 33-41.)  As discussed above, Swierkiewicz's statements regarding inconsistencies in Brayer's report are generally admissible including statements regarding

-14-

the absence of support for a particular opinion.  However, Swierkiewicz may not opine on whether statements constitute legal conclusions or opinions, and such statements are excluded.

Accordingly, defendant's motion to strike Swierkiewicz's revised report is granted in part and denied in part.

## E. Motion to Quash and for a Protective Order Regarding the Deposition of Thomas Pazdera (Doc. 213)

Defendant Affiliated FM moves to quash the deposition and subpoena of Thomas Padzera and further moves for a related protective order.  Plaintiffs seek to depose Padzera for the purpose of authenticating the claims handling manual in effect during the handling of their claim.

On June 3, 2011, plaintiffs requested from defendant "claims handling manual(s) or guidelines in effect since the Claims [*sic*] was reported to Affiliated [FM]."  Defendant objected to the request on grounds of overbreadth and relevance but on August 16, 2011, responded that it would produce claims handling documents.  The parties did not further discuss the documents until February 23, 2012, when plaintiffs deposed Michael Smith, the primary adjuster on plaintiffs' claim.  During the deposition, plaintiffs raised several questions regarding defendant's claim handling practices and procedures.  Because defendant had produced no documents, on February 27 and March 26, 2012, plaintiffs made further requests for the claims manual.  On April 25, 2012, defendant disclosed the destruction of documents reflecting the policies and procedures in effect during the handling of plaintiffs' claim pursuant to company policy.  Defendant provided the claims manual documents maintained in the ordinary course of business at the time, which included several outdated manuals but not the documents in effect during the handling of plaintiffs' claim.  On July 9, 2012, plaintiffs deposed Michael Smith again, and on July 10, 2012, plaintiffs deposed Craig Bern, who was employed by defendant as Division Senior General Adjuster.  At these depositions, both witnesses indicated a lack of knowledge regarding the relevant claims manual.

In June 2012, the parties disputed regarding the deposition of Gerry Alonso, Division Claims Manager, whereby plaintiffs further sought testimony about the relevant policies and procedures.  On July 27, 2012, the court ordered the deposition of Alonso and extended the discovery deadline to August 31, 2012.  On August 31, 2012, plaintiffs deposed Alonso but did not find the information sought.

Sometime between the court order and the Alonso deposition, plaintiffs served defendant written interrogatories regarding the relevant policies and procedures and a notice for a deposition under Fed. R. Civ. P. 30(b)(6) on document destruction issues. The discovery requests resulted in the agreement for defendant to produce corporate representative Brian Cook for deposition on November 16, 2012. On November 14, 2012, defendant produced hundreds of pages of additional claims guidelines including an allegedly complete copy of the guidelines in effect at the time of plaintiffs' claim handling.

During the deposition, in response to an inquiry regarding his basis for the contention that the guidelines effective during the relevant time were fully produced, Cook responded that he could find nothing else and further relied on his discussion with Thomas Padzera, a claim adjuster employed at defendant's St. Louis office. On November 26, 2012, plaintiffs informally requested Pazdera's deposition. On December 7, 2012, plaintiffs provided defendant with notice of the deposition scheduled on December 13, 2012 at the office of defendant's counsel. According to their motion brief, plaintiffs' concern that Cook's statements regarding his discussion with Padzera might constitute inadmissible hearsay motivates their attempts to depose Padzera.

Defendant argues that plaintiffs failed to comply with discovery deadlines and provide no compelling reason to reopen discovery to allow Pazdera's deposition. The applicable discovery deadline is August 31, 2012. (Doc. 154.) The court subsequently extended the deadline to December 14, 2012 for the limited purpose of completing previously requested discovery. (Docs. 163-64, 203-04.) However, it was not until November 2012 that Cook testified that his knowledge came from Padzera.

Defendant also moves to prohibit plaintiffs' attempts to depose Padzera under Fed. R. Civ. P. 26(b)(2)(C), which states:

> On motion or on its own, the court must limit the frequency or extent of discovery otherwise allowed by these rules or by local rule if it determines that:
>> (i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive;
>> (ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or
>> (iii) the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues.

Fed. R. Civ. P. 26(b)(2)(C).

Plaintiffs argue that deposing Padzera is necessary for the authentication of the claims manual. Plaintiffs state that the sole support for the authentication of the document is Cook's testimony about his discussion with Padzera and that this testimony constitutes inadmissible hearsay. The court agrees that if plaintiffs attempted to authenticate the claims manual with Cook's statements about his discussion with Padzera, plaintiffs would be using an out-of-court statement to prove the truth of the matter asserted and that no hearsay exception applies. See Cooley v. Lincoln Elec. Co., 693 F. Supp. 2d 767, 791 (N.D. Ohio 2010) ("the fact that a witness is a 30(b)(6) designee does not create a hearsay exception allowing him to simply repeat statements made by corporate officers and employees").

Defendant offers to stipulate the authentication of the claims manual. Other courts have considered the non-movant's offer to stipulate relevant facts to determine whether the discovery is "unreasonably cumulative or duplicative." Doe v. Univ. of Connecticut, 2012 WL 12745, *4 (D. Conn. 2012); Richardson v. Rock City Mech. Co., LLC, 2010 WL 711830, *4 (M.D. Tenn. 2010). However, defendant does not argue that the deposition would result in significant burden or expense. The court cannot conclude that the deposition would also produce no meaningful benefit. Because Pazdera's deposition is necessary in light of Cook's deposition, defendant's motion is denied.

## IV. PLAINTIFFS' MOTIONS

### A. Motion to Strike Impermissible Legal Conclusions and Other Opinions from Donald Brayer's Report (Doc. 183)

Plaintiffs move to strike certain portions of the report of defendant Affiliated FM's expert Donald Brayer. Defendant retained Brayer as an insurance expert to offer opinions regarding the reasonableness of defendant's conduct with respect to plaintiffs' insurance claim. Specifically, plaintiffs move to strike legal opinions and opinions regarding engineering and elevators.

Brayer's report discusses plaintiffs' insurance coverage, the effect of certain portions of the insurance agreement, the reasonableness of defendant's conduct, and the report of plaintiffs' expert Swierkiewicz. In short, the report contains many legal opinions regarding whether defendant breached contract and vexatiously refused to pay, which the Eighth Circuit has allowed. Cedar Hill Hardware, 563 F.3d at 340, 343-44.

Plaintiffs maintain that Brayer may not opine on industry practices, stating that Brayer has no knowledge of the insurance industry practices underlying his opinions. Specifically, plaintiffs cite to portions of Brayer's deposition testimony where he denies

-17-

knowledge of particular points of Missouri law.  (Doc. 186-3 at 2, 11, 13.)  However, Brayer states that he has over forty years of experience in the areas of commercial and professional insurance liability.  (Doc. 186-2 at 1.)  The court finds Brayer sufficiently qualified to opine on insurance industry practices.

Some of the opinions also concern the effects of red rouge, and plaintiffs maintain that Brayer is not qualified to opine on that topic.  Brayer claims no expertise in this area and appears to rely on Stabler's report and a website.  Significantly, Brayer does not opine on the effects of red rouge but accepts certain facts regarding the red rouge as true in order to opine on defendant's conduct.  Fed. R. Evid. 703 states that "[a]n expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed."  To the extent that the factual basis is faulty, "it is up to the opposing party to examine the factual basis for the opinion in cross-examination." Larson, 414 F.3d at 941.

Plaintiffs also challenge Brayer's statement that "Most jurisdictions require that inspections be performed on a periodic basis.  Since Archway noticed the presence of red rouging as early as 1994, it is quite likely an elevator inspector would have noticed it and commented on its effects."  (Doc. 186-2 at 29.) Plaintiffs argue that the opinion is impermissibly speculative and cite to portions of Brayer's deposition where Brayer admits a lack of knowledge regarding the detailed requirements of elevator inspections and the specific knowledge of inspectors.  However, Brayer also testified that he learned of the frequency of elevator inspections from expert reports.  (Doc. 186-3 at 6.)

"[E]xpert opinion should be excluded as too speculative only where it is "so fundamentally unsupported that it can offer no assistance to the jury." McKnight By & Through Ludwig v. Johnson Controls, Inc., 36 F.3d 1396, 1408 (8th Cir. 1994).  As stated above, Brayer's reliance on the expert reports is permissible.  However, while Brayer may opine regarding the conduct occurring during regular inspections, Brayer's use of the phrase "quite likely" indicates he is too speculative for that opinion to be admissible.

Accordingly, plaintiffs' motion to strike certain portions of defendant Affiliated FM's expert Donald Brayer is sustained in part and denied in part.

## B. Motion to Exclude Expert Thomas L. Hoops (Doc. 187)

Plaintiffs move to exclude defendant Affiliated FM's expert Thomas L. Hoops. Defendant retained Hoops to provide the opinion that the elevator breakdown did not cause plaintiffs' lost revenue and also offer an opinion regarding plaintiffs' expert Zetlmeisl's methodology.  Plaintiffs specifically challenge the sources used by Hoops to

compile factors affecting revenue, that Hoops could not quantify the effect of the factors on lost revenue, that Hoops ranked the factors by significance based solely on his personal opinion, and that he opined on plaintiffs' insurance coverage.

In his report, Hoops compiled factors that plausibly may have affected plaintiffs' decrease in revenue. (Doc. 190-1 at 6.)  Then, Hoops discussed the flaws of Zetlmeisl's methodology including the failure to consider such factors in his calculation of lost revenue attributable to the elevator breakdown.  (Id. at 6-8.)  He also opined regarding plaintiffs' insurance coverage.  (Id. at 7.)  In his deposition, he opined that the elevator breakdown caused no lost rent and ranked the factors in order of significance.  (Doc. 190-2 at 2, 11.)

Hoops may not offer the opinion that the elevator breakdown caused no lost rent. No methodology has been offered to support this opinion, and although introduction of the additional potential causes may cast doubt on Zetlmeisl's methodology, nothing in the report or in his deposition indicates that the elevator breakdown had no impact. Relatedly, Hoops may not offer the opinion that the other factors caused the lost rent. Although evidence may have supported the existence of such factors, Hoops provided no methodology indicating that the factors affected lost revenue and further failed to quantify the effect.  Accordingly, such statements are excluded.  Similarly, Hoops based the ranking of the factors in order of significance on his personal opinion with no reference to statistical data or evidence.  This ranking is excluded.

Hoops may not testify regarding insurance coverage because he has not been offered nor does he qualify as an insurance expert.  Accordingly, such statements are excluded.

However, Hoops may testify about Zetlmeisl's methodology including the failure to consider the additional factors, the difficult nature of isolating variables, and the narrow scope of the inquiry answered by his study.  Statistical analysis is within an accountant's expertise.  One need not demonstrate the existence and effect of plausibly relevant factors to show that a study would be more complete had they been considered.

Plaintiffs' motion to exclude defendant's expert Hoops is sustained in part and denied in part.

## C. Motion to Exclude Expert Ronald Creak (Doc. 194)

Plaintiffs move to exclude defendant Affiliated FM's expert Ronald Creak. Defendant retained Creak as an elevator expert to rebut plaintiffs' expert Joseph Stabler's opinion that red rouge was the sole cause of the elevator breakdown.   Specifically,

plaintiffs argue that Creak's opinions are unsupported and that Creak improperly opined regarding whether plaintiffs were negligent in the supervision of Archway Elevator and in the failure to obtain elevator inspections.

In his report, Creak opines that wear and tear, not red rouge, caused the elevator breakdown.  (Doc. 195-2 at 14.)  To arrive at these conclusions, Creak reviewed the elevator maintenance records and determined that they indicated that the time spent performing preventative maintenance and the number of service requests between routine maintenance performances varied significantly from the industry standards, which indicated that Archway Elevator and Midwest Elevator negligently maintained the elevators.  (Id. at 7, 9.)  Creak also observed the failure to inspect the elevators annually and at five-year intervals as required by applicable law.  (Id. at 10-11.)  Creak also classified the service tickets from 1994 to 2005 according to the nature of the elevator problem found during the service calls and found that red rouge necessitated only one service call during that time period.  (Id. at 8-9.)  Creak then concluded that negligent maintenance, failure to inspect, and the old age of the elevator equipment caused wear and tear on the elevator, which led to its breakdown, and that the effect of red rouge was minimal.  (Id. at 14.)

Plaintiffs argue that Creak impermissibly bases his opinion that wear and tear caused the breakdown solely on his speculation regarding negligent maintenance. Plaintiffs further argue that Creak's methodology is faulty because he did not evaluate the level of maintenance prior to Archway Elevator's service and because he failed to specify the timing of the particular component failures that occurred during Archway Elevator's service.

As stated above, Creak also based his opinions on the cause of the elevator breakdown and effect of red rouge on his findings regarding the lack of service calls addressing red rouge, the age of the equipment, and the failure to inspect.  Although Creak's opinion relies primarily on his service call analysis, Creak also reviewed witness depositions, other expert opinions, inspection guidelines, photographs, and court documents and has forty-eight years of experience with elevators.  (Id. at 2-4.)  Courts have permitted other experts to offer causation opinions relying on similar data.  See e.g. Jones v. Otis Elevator Co., 861 F.2d 655, 662-63 (11th Cir. 1988) (allowing expert testimony on the basis of inspection and review of elevator maintenance records); Kirkland v. Marriott Int'l, Inc., 416 F. Supp. 2d 480, 485-88 (E.D. La. 2006) (allowing expert testimony on the basis of inspection, review of witness statements and depositions, and elevator maintenance records and inspection tags).

-20-

Further, the fact that Creak did not consider the level of maintenance prior to Archway Elevator to establish a baseline to compare with subsequent maintenance does not render his opinion sufficiently unreliable to warrant exclusion. Although baselines are useful to predict future results or past results under changed circumstances, Creak's methodology does not seek to project results. See Victory Records, Inc. v. Virgin Records Am., Inc., 2011 WL 382743, *1 (N.D. Ill. 2011); R & R Int'l, Inc. v. Manzen, LLC, 2010 WL 3605234, *9-10 (S.D. Fla. 2010). Rather, Creak relies on comparing data regarding elevator service in the Jefferson Arms with industry standards and opined that due to the nature of the deviations, Archway Elevator performed maintenance in a negligent manner. Creak's methodology did not require a baseline representing the prior level of maintenance.

Additionally, Creak's failure to specify the timing of the particular component failures that occurred during Archway Elevator's service does not render his opinion inadmissible. Plaintiffs effectively challenge the basis of Creak's opinion. However, it is up to the opposing party to examine the factual basis for the opinion in cross-examination." Larson, 414 F.3d at 941.

Plaintiffs further argue that Creak based his opinion that Archway Elevator provided negligent maintenance on faulty statistics and improper methodology. In his report, Creak refers to industry standards regarding the appropriate monthly number of hours of elevator service and the appropriate number of service calls between routine maintenance performances. (Doc. 195-2 at 7, 9.) Specifically, plaintiffs argue that variance from these standards has a correlational relationship rather than a causational one with negligent maintenance. However, although the court recognizes that correlation should not be equated with causation, the court also declines to find these comparisons devoid of evidentiary value. Indeed, litigants often use variance from accepted norms as evidence of negligence. See e.g., Pitts v. Electro-Static Finishing, Inc., 607 F.2d 799, 804 (8th Cir. 1979); Poches v. J. J. Newberry Co., 549 F.2d 1166, 1168 (8th Cir. 1977). Plaintiffs also challenge Creak's opinion under Daubert. As stated above, Creak's methodology consisted of comparing the elevator service performed to industry standards. His calculations can be verified, and as stated above, the use of such deviations from established standards is a generally acceptable manner of determining negligence.

Plaintiffs next argue that Creak's opinions that Archway Elevators acted negligently, that plaintiffs negligently supervised Archway Elevator, and that plaintiffs negligently failed to inspect the elevators are improper legal conclusions. "The touchstone for the admissibility of expert testimony is whether it will assist or be helpful to the trier of fact."

McKnight, 36 F.3d at 1408.   Creak has not been offered as an apartment management expert and therefore, he may not testify regarding the negligent supervision of Archway Elevator.   (Doc. 195-1 at 5-6.)   Therefore, this opinion must be excluded.   However, Creak's qualifications are sufficient to opine on the maintenance of elevators.   Unlike expert testimony regarding the characteristics of a reasonable person excluded in many cases, Creak's opinions concern the characteristics of reasonable elevator maintenance. See e.g., Hartman v. Hallmark Cards, Inc., 833 F.2d 117, 120 (8th Cir. 2010); U.S. v. Whitfield, 31 F.3d 747, 749 (8th Cir. 1994).   Elevator maintenance is likely an unfamiliar topic to the jury, and therefore, an opinion regarding the quality of elevator maintenance will assist the jury.

Accordingly, plaintiffs' motion to exclude Creak's testimony is sustained in part and denied in part.

**D. Motion to Exclude or Limit the Testimony of Matthew O'Leary (Doc. 196)**

Plaintiffs move to exclude or limit defendant Affiliated FM's witness Matthew O'Leary.   Plaintiffs sold the Jefferson Arms apartment building in 2006 to Pyramid Construction.   O'Leary, as senior vice president of Pyramid Construction, visually observed the building several times and assisted in the preparation of a tax increment financing plan, which included plans for redevelopment.   Plaintiffs argue that, during trial, defendant may seek to elicit testimony from O'Leary regarding his personal observations and the tax increment financing plan.

Plaintiffs argue that O'Leary's testimony will consist of opinions that are "based on scientific, technical, or other specialized knowledge" and that because defendant failed to disclose O'Leary as an expert as required by Fed. R. Civ. P. 26(a)(2), his testimony should be excluded.

To illustrate their argument, plaintiffs cite to two portions of O'Leary's deposition. In the first portion, O'Leary testified about several statements from the tax increment financing plan regarding the condition of Jefferson Arms including:

- The exterior wall of the approximately 500,000 square feet building is significantly degraded and discolored in many places and is in need of tuckpointing and repair.

- Due to the building's age, masonry problems have been repaired in the past but in many places they are in need of serious attention.

- The basement and parking garage suffer from leakage as evidenced by water damage throughout.

(Doc. 197-3 at 7-9.)  In the second portion, O'Leary discussed the opinion that the building required a "gut rehab" and explained what "gut rehab" meant to him.  O'Leary also testified that the building's heating, ventilation, and air conditioning (HVAC) system was unusable.  (Id. at 13.)

Fed. R. Evid. 701(c) states, "If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."  Regarding the first portion, the statements are not sufficiently based upon specialized knowledge to qualify as expert testimony.  Although testimony regarding masonry, tuckpointing, and water damage could conceivably stray into the realm of expert testimony, laymen are capable of identifying the basic fact that some rehabilitative work is required.  O'Leary does not extensively testify regarding the specific details of these topics.  Rather, during the deposition, defendant's counsel, armed with the knowledge that O'Leary verified the facts in the tax increment financing plan by affidavit, pointed to the various facts and asked O'Leary about his personal observations supporting those statements.  (Doc. 197-3 at 7-11; Doc. 197-4 at 22.)  The court finds that such testimony is within the realm of admissible lay testimony.

Regarding the second portion, although O'Leary discussed opinions regarding "gut rehab" and HVAC systems, these opinions differ from those typically offered as expert testimony.  In contrast to the typical expert retained to offer an opinion for the sole purpose of litigation, O'Leary testified about the process of arriving at these conclusions, which eventually led to the consummation of the sale.  Such testimony does not rest on specialized knowledge.  The jury might mistake such testimony as expert opinion, but cross-examination is well-suited to combat this danger.

Accordingly, O'Leary's testimony is not based on scientific, technical, or specialized knowledge and therefore, does not violate Fed. R. Evid. 701(c).

Plaintiffs further argue that O'Leary's testimony will include the opinions of the architect and construction manager who assisted O'Leary in preparing the tax increment plan and that this "parroting" is impermissible.  To support this contention, plaintiffs again cite to portions of O'Leary's deposition where he testified about the condition of the building and also to his testimony that others drafted parts of the tax increment financing plan.  However, O'Leary adopted these statements as his own, despite the fact that others may have thought of them first or that others drafted parts of the plan.  (Doc. 197-3 at 7.)  As stated above, these statements are based on O'Leary's personal observations, which he verified through a sworn affidavit.

Relatedly, plaintiffs also argue that O'Leary's testimony is unreliable because he cannot remember the basis for some of the statements in the tax increment plan. Fed. R. Evid. 701(a) requires that lay testimony be "rationally based on the witness's perception." Significantly, plaintiffs do not argue that the opinions lack a basis in personal observation but focus on the limitations of O'Leary's recollection. Further, the record belies the contention that personal observation does not support these statements.

Thus, the appropriate inquiry is whether the statements constitute permissible hearsay. Hearsay is an out of court statement used to prove the truth of the matter asserted. Fed. R. Evid. 801(c). Insofar as O'Leary testifies about his personal observations supporting the statements, such testimony does not constitute hearsay. However, the statements in the tax increment plan are hearsay and must fall under a recognized exception for admissibility. Fed. R. Evid. 802.

The Federal Rules of Evidence provide an exception for a recorded recollection, which is defined as:

> A record that:
> (A) is on a matter the witness once knew about but now cannot recall well enough to testify fully and accurately;
> (B) was made or adopted by the witness when the matter was fresh in the witness's memory; and
> (C) accurately reflects the witness's knowledge.

Fed. R. Evid. 803(5).

The affidavit and deposition testimony indicate that these requirements are met. Therefore, in accordance with Fed. R. Evid. 803(5), "the record may be read into evidence but may be received as an exhibit only if offered by an adverse party."

Finally, plaintiffs seek to exclude testimony regarding other statements left unaddressed during the deposition from the same portion of the tax increment financing plan that contains the observational statements. (Doc. 197-4 at 13-15.) The court finds that the unaddressed statements do not vary significantly from the statements discussed above.

Accordingly, plaintiffs' motion to limit or exclude O'Leary's testimony is denied.

## V. CONCLUSION

For the reasons stated above,

**IT IS HEREBY ORDERED** that the motion of defendant Affiliated FM Insurance Company to exclude the expert report and testimony of Joseph Stabler (Doc. 176) is sustained in part and denied in part.

-24-

**IT IS FURTHER ORDERED** that the motion of defendant Affiliated FM Insurance Company to exclude the expert report and testimony of Thomas Zetlmeisl (Doc. 178) is sustained in part and denied in part.

**IT IS FURTHER ORDERED** that the motion of defendant Affiliated FM Insurance Company to strike the revised report of Akos Swierkiewicz (Doc. 185) is sustained in part and denied in part.

**IT IS FURTHER ORDERED** that the motion of defendant Affiliated FM Insurance Company to exclude the expert report and testimony of C. Stephen Carr (Doc. 189) is denied.

**IT IS FURTHER ORDERED** that the motion of defendant Affiliated FM Insurance Company to exclude the expert report and testimony of Howard Frank (Doc. 192) is denied.

**IT IS FURTHER ORDERED** that the motion of defendant Affiliated FM Insurance Company to quash and for a protective order (Doc. 213) is denied.

**IT IS FURTHER ORDERED** that the motion of plaintiffs Lloyd's Acceptance Corp. and Affordable Communities, LP, to strike the report of Donald Brayer (Doc. 183) is sustained in part and denied in part.

**IT IS FURTHER ORDERED** that the motion of plaintiffs Lloyd's Acceptance Corp. and Affordable Communities, LP, to exclude the expert report and testimony of Thomas L. Hoops (Doc. 187) is sustained in part and denied in part.

**IT IS FURTHER ORDERED** that the motion of plaintiffs Lloyd's Acceptance Corp. and Affordable Communities, LP, to exclude the expert report and testimony of Ronald Creak (Doc. 194) is sustained in part and denied in part.

**IT IS FURTHER ORDERED** that the motion of plaintiffs Lloyd's Acceptance Corp. and Affordable Communities, LP, to exclude or limit the testimony of Matthew O'Leary (Doc. 196) is denied.


_____/S/   David D. Noce_____
**UNITED STATES MAGISTRATE JUDGE**

Signed on September 6, 2013.